# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION


**American Energy Corp.**, *et al.*,

        **Plaintiffs,**

**v.**                                       **Case No.:  2:09-cv-623**
                                                    **JUDGE SMITH**
                                                    **Magistrate Judge Abel**

**Texas Eastern Transmission, LP,**

        **Defendant.**


## OPINION AND ORDER

This matter is before the Court on Defendant Texas Eastern Transmission, LP's Motion to Dismiss for Failure to State a Claim Upon Which Relief May be Granted (Doc. 4).  Plaintiffs American Energy Corporation and Consolidated Land Company have filed a Memorandum in Opposition, and Defendant has filed a Reply.  This Motion is therefore fully briefed and ripe for review.  For the reasons that follow, this Court **DENIES** Defendant's Motion to Dismiss.

## I.    FACTS

Plaintiff Consolidated Land Company ("Consolidated") is the real property owner of certain coal estates located in Monroe County, Ohio ("the Coal Estates").  Plaintiff American Energy Corporation ("American Energy" or "AEC") leases the rights to mine all of the coal in the Coal Estates from Consolidated, including the right to extract all of the coal by longwall mining.  (Compl. ¶¶ 4, 18).  American Energy operates a full-extraction coal mine, known as the Century Mine, pursuant to a permit issued by the Ohio Department of Natural Resources ("ODNR"),

Mineral Resources Management. (Compl. ¶1). Defendant Texas Eastern Transmission, LP ("Texas Eastern" or "TET") is involved in the interstate transportation and storage of natural gas through its large interstate transmission pipeline network, including operation of pipelines that run through the State of Ohio, as authorized by the Federal Regulatory Commission ("FERC") pursuant to the Natural Gas Act ("NGA"). (Compl. ¶ 7). Pursuant to FERC approval, Texas Eastern operates interstate natural gas pipelines that originate in Texas, Louisiana, and the Gulf of Mexico and pass through Mississippi, Arkansas, Missouri, Tennessee, Illinois, Indiana, Kentucky, Ohio, Pennsylvania, and New Jersey.

This action relates to sections of four of Texas Eastern's pipelines located in Monroe County, Ohio. (Compl. ¶¶ 10, 20 & 57). Sections of the pipelines in Monroe County were installed in the 1950's in surface rights-of-way acquired in 1943 and transferred to Texas Eastern in 1947. (Compl. ¶¶ 20-22). Three of these pipelines (the "Active Pipelines") are, and for the foreseeable future will remain, active. (Compl. ¶ 57). The fourth (the "Inactive Pipeline") will soon be inactive.[1] (Compl. ¶ 58).

Plaintiffs are the successors in interest to the original grantees of the dominant Coal Estates, located at or near Century Mine. (Compl. ¶ 9). Plaintiffs own extensive and superior rights in the property to mine and remove all of the coal. These extensive rights include the uninterrupted right to mine all of the coal and subside the surface estates located above the Coal Estates without liability for any damages. (Compl. ¶¶ 9, 14).

---

[1] American Energy represents that Texas Eastern has refused to provide a firm deadline for the inactivation of this pipeline, and as long as it is active, it interferes with its property rights.

On October 22, 1984, ODNR issued a coal mining permit (No. D-0425) (the "Permit") to Plaintiffs' predecessor-in-interest that provided for full-extraction longwall coal mining. This method of mining extracts all of the coal along a long continuous working face. (Compl. ¶¶ 27, 29). The mine became fully operational in 2001. Consolidated purchased the Coal Estates and transferred the Permit to American Energy in 2002. (Compl. ¶¶ 2, 17, and 26).

For years, American Energy conducted longwall coal mining activities at the Century Mine pursuant to the above-referenced Permit. On June 11, 2008, American Energy filed a Permit Adjacent Area Application No. D-0425-9 (the "Application") with ODNR, seeking to expand its mining area to add additional coal acreage. (Compl. ¶¶ 31-32). The additional area is located under Transmission Lines 10, 15, and 25 in Monroe County, Ohio. (Compl. ¶ 33). On June 23, 2008, American Energy provided Texas Eastern with notification that it planned to longwall mine beneath or adjacent to Transmission Lines 10, 15, and 25. (Compl. ¶ 35). On March 31, 2009, ODNR approved the Application and issued Permit Revision No. D-0425-9 to American Energy. (Compl. ¶ 34). Texas Eastern, however, has appealed this permit revision to the Ohio Reclamation Commission to clarify the obligations of American Energy under state mining law. (*See Texas Eastern Transmission, LP v. Husted*, Case No. RC-09-003).

The concern raised by Plaintiffs is that if measures are not taken to protect the pipelines from subsidence or related damage, American Energy's mining operations will compromise pipeline integrity and threaten to disrupt the interstate transmission of natural gas.[2] (Compl. ¶¶ 38

---

[2] Plaintiffs do not allege that Defendant Texas Eastern has prevented them from going forward with the longwall mining, only that Defendant has refused to develop a mitigation plan. It appears that Plaintiffs could secure the pipelines and proceed with the longwall mining at their expense.

& 41). Plaintiffs rely on the coal severance deeds, including waivers of surface support and related damages, acquired prior to 1913 by its predecessors in interest. (Compl. ¶ 11). The severance deeds convey ownership of the coal to be mined, provide the grantee with a right of way to access and mine the coal, and waive "all surface damages or damages of any sort arising therefrom or from the removal of all said coal." (Compl. ¶ 13). American Energy, purporting to exercise rights it claims were conferred on it by the severance deeds and by "law," requested that Texas Eastern develop, implement, and pay for a mitigation plan to avoid interfering with a Coal Estate owner's superior property rights, including the right to mine all coal. (Compl. ¶ 37, 42). Plaintiffs have requested that Texas Eastern develop, implement, and pay for a mitigation plan so that it could commence its mining activities and subside the surface estates, including Texas Eastern's easement. Plaintiffs assert that Texas Eastern's refusal to develop such a mitigation plan has impacted their business interests and will result in the sterilization of Plaintiffs' Coal Estates, which is approximately 3.2 million tons of coal, at a loss of over one hundred million dollars. (Comp. ¶¶ 47, 55).

Plaintiffs initiated this action on June 15, 2009 in the Court of Common Pleas for Monroe County, Ohio, seeking a declaration that: (1) its superior property rights provide entitlement to mine all of its coal in the Coal Estates; (2) Plaintiffs are entitled to mine all of the coal under Texas Eastern's transmission lines 10, 15, and 25 through the longwall mining process and subside the surface estates, including Texas Eastern's easement without interference from Texas Eastern, and without liability for damages; (3) Texas Eastern is required to prudently develop a mitigation plan, as well as to take and pay for mitigation measures to Texas Eastern's transmission lines 10, 15, and 25; and (4) Texas Eastern's transmission line 3 is required to be

inactive or have mitigation measures taken to it by a certain date. (Compl. ¶ 72). Defendant then removed the case to this Court on the basis of diversity jurisdiction.[3] Defendant Texas Eastern then moved to dismiss Plaintiffs' Complaint and this Motion is now before the Court.

## II.    STANDARD OF REVIEW

A 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief [.]" A court, in considering a 12(b)(6) motion to dismiss, must "construe the complaint in the light most favorable to the plaintiff," accepting as true all the plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

To survive dismissal pursuant to Rule 12(b)(6), however, a claim must "contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The United States Supreme Court, in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), clarified *Twombly's* plausibility standard:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).

---

[3] Plaintiffs bring to the Court's attention that Defendant did not raise federal question jurisdiction as a basis for removal, yet assert in its Motion to Dismiss that Plaintiffs' claims are preempted by federal law. (Pls' Memo. at 7).

Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not "show[n]" -- "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Id.*, at 1949-50.

## III.   DISCUSSION

Defendant Texas Eastern has moved to dismiss Plaintiffs' Complaint in its entirety, asserting that Plaintiffs have failed to state a claim upon which relief can be granted. Defendant asserts that Plaintiffs' Ohio law claims that Defendant must develop a mitigation plan (Counts I, II and III) are preempted by the Pipeline Safety Act ("PSA"), 49 U.S.C. §§ 60101 *et seq.*, and the comprehensive pipeline safety regulations administered by the United States Department of Transportation ("USDOT"). Defendant argues, in the alternative, that Plaintiffs are not entitled to the relief sought because the sole remedy available is to bring an inverse condemnation action under the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717 *et seq.*; that Plaintiffs have failed to allege facts that Defendant Texas Eastern's conduct caused its alleged injury; and that Plaintiffs' claims are barred by the statute of limitations. Finally, Defendant Texas Eastern argues that Plaintiffs' claim for nuisance under Ohio law (Count IV) must be dismissed for failure to state a claim. The Court will address each of Defendant's arguments in turn.

A.     **Federal Preemption**

Defendant Texas Eastern argues that Plaintiffs' state law claim that Defendant must develop a mitigation plan is preempted by the PSA. The Preemption Doctrine is rooted in the Supremacy Clause of the United States Constitution, Article VI, clause 2, which states,

> this Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Preemption exists under the Supremacy Clause where: (1) Congress expressly intended to preempt state law, *see Jones v. Rath Packing Co.*, 430 U.S. 519 (1977); (2) there is actual conflict between federal and state law, *see Free v. Bland*, 369 U.S. 663 (1962); (3) compliance with both federal and state law is impossible, *see Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963); (4) there is implicit in federal law a barrier to state regulation, *see Shaw v. Delta Airlines, Inc.*, 463 U.S. 85 (1983); (5) Congress has "occupied the field" of the regulation, leaving no room for a state to supplement the federal law, *see Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947); or (6) the state statute forms an obstacle to the realization of Congressional objectives, *see Hines v. Davidowitz*, 312 U.S. 52 (1941). *See generally, National Fuel Gas Supply Corp. v. Public Service Comm. of New York*, 894 F.2d 571 (2nd Cir. 1990); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988).

Several general rules of interpretation set the stage for a preemption analysis. First, although there is a presumption against federal preemption when Congress legislates in a field traditionally occupied by the states, the presumption is inapplicable in fields where the federal government has had a longstanding regulatory presence. *See United Parcel Service, Inc. v.*

*Flores-Galarza*, 318 F.3d 323, 336 (1st Cir. 2003).  Second, "[a] pre-emption question requires an

examination of congressional intent."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299

(1988).  Third, "the best indication of Congress' intentions, as usual, is the text of the statute

itself."  *South Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 65 (1st Cir. 2000).  Finally,

to determine Congress' intent, the Court must consider not only the statute itself, but the federal

regulations implementing and explaining it.  *See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691,

699 (1984).  With these guidelines in mind, the Court turns to the federal statute in question, the

PSA.[4]

The purpose of the PSA is "to provide adequate protection against risks to life and

property posed by pipeline transportation and pipeline facilities by improving the regulatory and

enforcement authority of the Secretary of Transportation."  49 U.S.C. § 601029(a)(1).  To

achieve this purpose, Congress instructed the Department of Transportation to "prescribe

minimum safety standards for pipeline transportation and for pipeline facilities."  49 U.S.C. §

60102(a)(2).  With respect to interstate pipelines, Congress also expressly preempted all state

laws and regulations purporting to impose additional safety requirements on interstate pipeline

operations: "A State authority may not adopt or continue in force safety standards for interstate

pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60102(c).  "The Act's text,

its legislative history, administrative implementation, and judicial interpretation attest to federal

preemption of the field of safety with respect to the establishment and enforcement of standards

---

[4] The PSA, enacted in 1994, combined and recodified, without substantive changes, the
two then-existing pipeline safety statutes, the Hazardous Liquid Pipeline Safety Act of 1979 and
the Natural Gas Pipeline Safety Act of 1968.

regulating the interstate transmission of gas by pipeline." *Tenneco Inc. v. Public Service Comm'n of West Virginia*, 489 F.2d 334, 336 (4th Cir. 1973).

Defendant Texas Eastern argues that this Court must dismiss Plaintiffs' Complaint because Plaintiffs' claim that Defendant must develop and implement a mitigation plan to protect its pipelines from the harmful effects of subsidence caused by Plaintiff American Energy's mining is preempted. Defendant asserts that "Congress has occupied the field with respect to interstate pipeline safety and neither AEC, through common law claims, nor this Court, by granting the relief requested by AEC, may supplement the pervasive regulatory scheme adopted by PHMSA."[5] (Def.'s Mot. at 11). Defendant further argues that "Courts (including this Court), respecting Congressional intent, noting the pervasiveness of PHMSA's regulatory scheme, and appreciating the need for uniform regulation of interstate pipelines, agree that the PSA completely preempts state law in the field of pipeline safety." (Def.'s Mot. at 9).

Defendant relies on a number of cases in support of its preemption argument, including: *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006) (PSA preempted the City of Seattle from enforcing its own more stringent pipeline safety provisions); *and ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465 (8th Cir. 1987) (Iowa law imposing safety standards for pipelines was preempted). However, the cases cited by Defendant primarily involve state laws or regulations that directly infringe on the occupied field by regulating interstate pipeline safety, but that is not the case here.

----

[5] As directed by the PSA, the USDOT, Pipeline and Hazardous Materials Safety Administration ("PHMSA") has adopted comprehensive regulations governing virtually all aspects of the operation and maintenance of interstate pipelines and related facilities. See 49 C.F.R. Subchapter D (§§ 190.1 *et seq.*).

Notably, if the Court were to accept Defendant's argument that Plaintiffs' claims are preempted by federal law, then Plaintiffs would be left without any recourse, as there is no private right of action under the PSA. *See Slavich v. Broadhurst*, 1993 U.S. Dist. LEXIS 16993 (E.D. La. 1993).

Plaintiffs, however, argue that Defendant's argument misconstrues their claims, the PSA, and the doctrine of preemption. Plaintiffs assert that they are seeking a declaration from this Court recognizing its superior property rights and preventing Defendant's interference with Plaintiffs' longwall mining. Plaintiffs argue that the PSA does not supplant state real property law. *See, e.g.*, 49 U.S.C. § 60121(d) ("This section does not restrict a right to relief that a person . . . may have under another law or at common law."); *Columbia Gas Transmission Corp. v. Meadow Preserve York, LLC, et al.*, 2006 U.S. Dist. LEXIS 30645, at *15-16 (N.D. Ohio May 17, 2006) (*citing Columbia Gas Transmission Corp. v. Drain*, 191 F.3d 552, 555 (4th Cir. 1999)) ("The [PSA] and regulations are silent as to rights-of-way and easements.").

Plaintiffs further argue that torts are expressly exempted from the preemptive reach of the PSA. 49 U.S.C. § 60120(c) ("This chapter [49 USCS §§ 60101 et seq.] does not affect the tort liability of any person."); *see also Abramson, et al. v. Florida Gas Transmission Co.*, 909 F. Supp. 410, 417 (E.D. La. 1995). In *Abramson*, the district court was faced with whether the NGA or PSA preempted the plaintiffs, the property owners' claims for remediation damages to their property following a reconditioning project on a natural gas pipeline that traverses their property. Plaintiffs claims consisted of breach of contract and negligence. Defendants in *Abramson* argued that "federal law preempts remediation damages because federal law governs

the rights of plaintiffs as property owners on whose property runs a natural gas pipeline pursuant

to a right-of-way agreement." (*Id*. at 416). The *Abramson* court, in its analysis, stated:

> While the Natural Gas Act, 15 U.S.C. § 717 et seq., regulates "natural-gas companies," such as Florida Gas, 15 U.S.C. § 717a(6), its purpose is to regulate natural gas transported and sold in interstate commerce. 15 U.S.C. § 717(a) and (b). The Court's review of the Natural Gas Act reveals nothing which specifically states that actions such as plaintiffs' for damages to property through which pipelines run are preempted.
>
> Further, the Court's analysis of the Natural Gas Act reveals that Congress has not attempted to legislate so comprehensively as to occupy the field of regulation of cases involving property damages, such as that alleged by plaintiffs. Nor does Louisiana contract, tort, or property law at issue in this case conflict with federal regulation of transportation and sale of natural gas. These areas of state law do not stand as an obstacle to congressional objectives in the federal government's regulation of sale and transportation of natural gas.[6]

*Id*. at 416.

The *Abramson* court continued, in holding that:

> Neither is there preemption under the Natural Gas Pipeline Safety Act, 49 U.S.C. § 60101 et seq. There exists no explicit preemption language in this act or any evidence of inferences of preemption. Indeed, two separate sections of the Natural Gas Pipeline Safety Act provide, respectively, that the act does not 'affect the tort liability of any person,' 49 U.S.C. § 60120(c), and a private right of action under the act 'does not restrict a right or relief that a person or a class of persons may have under another law or common law.' 49 U.S.C. § 60121(d).

*Id*. at 417.

---

[6] "In *Northwest Central Pipeline*, the Supreme Court stated that "where state law impacts on matters within [Federal Energy Regulatory Commission's] control, the State's purpose must be to regulate production or other subjects of state jurisdiction, and the means chosen must at least plausibly be related to matters of legitimate state concern." *Northwest Central Pipeline*, 489 U.S. at 518, 109 S. Ct. at 1278. Here, it is not clear that state law impacts on matters within FERC's control. Even so, however, it is also clear that the state's areas of law relating to damages to property owners on whose property pipelines run are a legitimate state concern." (Footnote in original).

There is no dispute between the parties that the PSA preempts state laws regarding pipeline safety. However, the question before the Court is whether Plaintiffs' claims under Ohio property and tort common law are related to pipeline safety, and in turn, preempted by the PSA. The Court agrees with Plaintiffs that no state safety standard for interstate pipelines is at issue in this case. Defendant Texas Eastern has not shown that Congress intended to preempt the Ohio laws at issue in this case, that there is a conflict between Ohio law and the PSA such that compliance with both is impossible or would prevent the accomplishment of congressional objectives,[7] nor that Congress legislated comprehensively to occupy an entire field of regulation, leaving no room for the Ohio laws at issue. *See NW Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas, et al.*, 489 U.S. 493, 510-11 (1989) ("Congress did not envisage federal regulation of the entire natural-gas field.").

Plaintiffs claim that they own superior real property rights in the land at issue in this case and that Defendant Texas Eastern's acts and failures to act wrongfully interfere with their right to mine all of its coal without any liability to the surface estates, including Texas Eastern's pipelines. There is Ohio law that addresses the claim raised by Plaintiffs. Ohio law provides that the Coal

---

[7] On the contrary, the PSA is consistent with the Ohio laws under which Plaintiff seeks relief. The PSA's declared purpose is "to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities…." 49 U.S.C. § 60102(a)(1). In furtherance of this purpose, the statutes and regulations seem to place the burden of compliance on the pipeline operator. For example, the PSA and implementing regulations provide as follows: "The operator must take all practicable steps to protect each transmission line or main from washouts, floods, unstable soil, landslides, or other hazards that may cause the pipeline to move or to sustain abnormal loads." 49 C.F.R. 192.317(a). "[E]ach operator of a buried pipeline must carry out … a written program to prevent damage to that pipeline from excavation activities. 49 C.F.R. 192.614(a). "An operator must take additional measures beyond those already required by Part 192 to **prevent a pipeline failure and to mitigate the consequences of a pipeline failure** in a high consequence area." 49 C.F.R. 192.935(a) (emphasis added).

Estates may be severed from the surface estates, as was the case here. *See Graham v. Drydock Coal Co., 76 Ohio St. 3d 311 (1996); see also Ohio Valley Coal Co. v. E. Ohio Gas Co.*, Case No. 91-CIV-210 (Belmont Co. Ohio 1992); *Wells v. American Electric Power Co.*, 48 Ohio App. 3d 95 (4th App. Dist. 1988). Ohio law further provides that the timing and language of the deeds at issue control because the deed language expresses the intent of the parties to the transaction. *See Ohio Valley Coal, 91-CIV-210 at 5-6.*

In *Ohio Valley Coal*, the court held that an easement holder may not use its easement in a way that prevents a coal estate owner from mining its coal. Essentially, the easements are subject tot he rights of the mineral interest holder whose rights were acquired prior to those of the surface easement holder. *Id.* at 5-6. The court also found that the Natural Gas Act, the Natural Gas Policy Act, and the Natural Gas Pipeline and Safety Act "have no bearing on property rights disputes." *Id.* at 8.

Plaintiffs also cite to *American Energy Corp. v. Datkuliak*, 174 Ohio App. 3d 398 (7th Dist. Ohio 2007), in support of their argument against preemption. In *Datkuliak*, the owners of the property owned the surface estate and the oil and gas estate. The companies owned the coal estate pursuant to a coal severance deed, and they sought to have the owners cap and plug their gas well that was within the coal seam. The trial court determined that the deed language was clear and unambiguous, and that the companies had the right to all of the coal in the coal estate and to have the well plugged and capped. On appeal, although finding that no justiciable controversy remained, the court still held that based on the clear and unambiguous deed language, the companies had the right to mine all of the coal. *Id.*

Plaintiffs also rely on *Consolidated Land Co., et al. v. Capstone Holding Co., et al.*, 2002 Ohio App. LEXIS 7234 (Ohio Ct. App. Dec. 31, 2002). In *Consolidated Land*, the court interpreted similar deed language to that at issue in this case and held that "[t]hese rights along with the waiver of damages provisions grant enormous entitlements to [the owner of the subsurface coal estates]. The clear language of these Deeds provides that [the owners of the coal estates] may do whatever is necessary to mine all of their coal and [the owners of the surface estates] cannot stop the damage that may result." *Id.* at *16.

Plaintiffs therefore argue that, like the *Ohio Valley Coal, Datkuliak* and *Consolidated Land Co.* courts, Plaintiffs' claims sound in property law and require this Court to look only to the deed language and interpret the intent of the parties at the time of the grant. Plaintiffs assert that the Coal Severance Deeds predate the After-Acquired Pipeline Easements and provide the right to mine all of the coal therein without interference and without any liability for damage to the surface estates.

The issue before the Court, at this time, is not to determine Plaintiffs' rights to mine the coal, but rather, whether they have stated a claim. The Court finds that Plaintiffs have stated sufficient claims and that their claims are not preempted by federal law. The PSA does not preempt Ohio property or tort law. The PSA itself provides that it "does not affect the tort liability of any person." 49 U.S.C. § 60120(c). Further, as discussed in *Abramson*, 909 F. Supp. at 416, neither the PSA, nor the NGA, prevents claims based on state contract, tort, or property law. The *Abramson* court noted, "that the state's areas of law relating to damages to property owners on whose property pipelines run are a legitimate state concern." *Id.* at 416. Accordingly, Defendant's Motion to Dismiss Plaintiffs' claims based on preemption is denied.

**B.     Plaintiffs' remedy sought is not available**

Defendant Texas Eastern next argues that Plaintiffs have failed to state a claim because the exclusive remedy for the injuries which they claim is an action for inverse condemnation under the NGA.  Defendant Texas Eastern asserts that it has the power of eminent domain, pursuant to the NGA.  15 U.S.C. § 717f(h).  Inverse condemnation is "an action or eminent domain proceeding initiated by the property owner rather than the condemnor, and is deemed to be available where: (1) private property has been taken in fact for public use, although not through eminent domain procedures; and (2) it appears that the taker has no intention, willingness, or ability to bring such proceedings."  27 Am Jur. 2d § 742; *United States v. Clark*, 445 U.S. 253, 257 (1980).

Defendant argues that it may exercise the power to take "the necessary right-of-way to construct, operate, and maintain a pipe line." 15 U.S.C. § 717f(h).  Defendant further states that the "power of eminent domain under the NGA includes the power to take mineral estates necessary to support pipelines."  (Def.'s Mot. at 12) (*citing East Tennessee Natural Gas, LLC v. 1.28 Acres in Smyth County, Virginia*, 2006 U.S. Dist. LEXIS 24450 at *32 (W.D. Va. 2006) ("While there is no doubt that the construction of this pipeline across certain of these properties may affect the mineral rights owners' ability to mine these resources, that is an issue to be considered in the just compensation stage of these proceedings" commenced under 15 U.S.C. § 717f(h))).

Defendant asserts that when an entity is vested with the power of eminent domain, like it is, the entity can take property for a public purpose and when that interferes with the property right of the owner, the remedy available to the owner is to seek compensation by an inverse condemnation action.  Defendant Texas Eastern argues that Plaintiffs' exclusive remedy is such an

action in this case because they have alleged that Defendant has taken coal for the purpose of maintaining its pipelines.

Plaintiffs, on the other hand, argue that Defendant's arguments are incorrect: that a taking has not been alleged; and that inverse condemnation is not the exclusive remedy for a taking. Plaintiffs assert that Defendant misrepresented their Complaint, which in fact states that "Plaintiffs' Coal Estates will be sterilized . . .," and that Texas Eastern's action "will prevent AEC from mining all of its coal . . .." (Compl. ¶¶ 48, 56). Plaintiffs assert that they did not allege a taking or sue for inverse condemnation because such a cause of action has not accrued. An action for inverse condemnation does not arise unless and until a taking has occurred. Further, Plaintiffs assert that they are entitled to choose which causes of action to bring and which legal theories to rely on. The Court agrees that Plaintiffs can choose what causes of action to assert. *See Warthman v. Genoa Twp. Bd. of Trustees*, 549 F.3d 1055, 1063 (6th Cir. 2008).

Plaintiffs also argue that even if they had alleged a taking, an action for inverse condemnation is not their only recourse. *See Beck v. Atl. Ritchfield Co.*, 62 F.3d 1240, 1243 (9th Cir. 1995) (the fact that a plaintiff might have a federal takings claim against an entity does not preclude him from brining other state law claims as well). Inverse condemnation claims can be combined with other causes of action. *See Columbia Gas Transmission Corp. v. Gwin*, 198 F.3d 244 (6th Cir. 1999) (considering landowners' nuisance, unjust enrichment, and inverse-condemnation counterclaims). Plaintiffs argue that the principal case relied on by Defendant, *Columbia Gas Transmission Corp. v. An Exclusive Natural Gas Storage Easement*, 747 F. Supp. 401 (N.D. Ohio 1990), is not applicable because unlike the plaintiff in that case, Plaintiffs here

deny that Defendant Texas Eastern has or is entitled to exercise eminent domain rights to take their coal estates.

The Court agrees with Plaintiffs, that they have not alleged a cause of action for inverse condemnation and do not have such a claim at this time, as there has been no taking. Even if a taking had been alleged, or a taking occurs at some later time, Plaintiffs are not limited to an inverse condemnation action to recover just compensation. Therefore, Defendant's Motion to Dismiss Plaintiffs' Complaint on this ground is denied.

**C.      Failure to allege facts that Defendant caused Plaintiffs' alleged injury**

Defendant further argues that Plaintiffs' Complaint is deficient and must be dismissed because they failed to plead facts to establish an essential element of the four counts asserted, specifically, that Defendant's conduct caused or will cause the injury to Plaintiffs' property interests.

To state a claim for injury to property under Ohio law, a plaintiff must allege facts sufficient to show that the defendant's conduct caused the plaintiff's injury. *Weber v. Obuch*, 2005 Ohio App. LEXIS 6314 at *7 (Ohio Ct. App. 2005) (in an action for damage to real property, "[i]t is a plaintiff's burden to prove causation between the damages claimed and the tort"); *see also Haney v. Timken Co.*, 2003 Ohio App. LEXIS 1609 at *13-14 (Ohio Ct. App. 2003) ("In tort law, the plaintiff must prove that the defendant's acts proximately caused injury to the plaintiff.").

Defendant argues that Plaintiffs' Complaint contains conclusory assertions that Defendant has interfered with their ability to mine coal. Defendant asserts that under *Bell Atlantic* and *Iqbal*, the Plaintiffs must allege facts sufficient to establish the requisite causation, as allegations that

-17-

"are no more than conclusions" are "not entitled to the assumption of truth." *Iqbal*, 129 S.Ct. at 1950.

Plaintiffs, however, argue that their twenty-three page Complaint is "replete with factual allegations tying TET's actions and failures to act to the damages claimed." (Pls.' Memo. at 27). The Court agrees with Plaintiffs that the Complaint exceeds the pleading standard requiring "a short and plain statement of the claim showing that the pleader is entitled to relief. . .." Fed. R. Civ. P. 8(a)(2). Further, the complaint need only "give the defendant fair notice of what the claim is and the grounds upon which it rests . . .." *Bell Atlantic*, 550 U.S. at 555. Plaintiffs allege that Defendant Texas Eastern is obligated to develop, implement and pay for a mitigation plan and that the failure to do so intentionally interferes with Plaintiffs' property rights, and will prevent them from mining all of its coal. Accordingly, Plaintiffs have sufficiently alleged that Defendant's affirmative acts or failures to act, have and will continue to cause Plaintiffs harm. Defendant's Motion to Dismiss for failure to allege causation is therefore denied.

## D.    Statute of Limitations

Defendant Texas Eastern argues that Plaintiffs' claims must be dismissed because they are barred by the statute of limitations. Although the statute of limitations is typically an affirmative defense requiring factual development, where the application of the statute is clear on the face of the complaint, the court may consider the defense upon a motion to dismiss. *See Hoover v. Langston Equip. Assoc., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992) ("The defense of the statute [of limitations] may be raised on a motion to dismiss under Rule 12(b)(6) when it is apparent from the face of the complaint that the time limit for bringing the claim has passed.").

Defendant argues that it is clear from the face of the Complaint that Plaintiffs' claims are barred by the four-year statute of limitations period on claims for damages to real property set forth in Ohio Revised Code § 2305.09(D). Defendant asserts that the statute of limitations ran years ago, or at the very least, in 1984 when ODNR issued the original permit for Century Mine. Defendant asserts that Plaintiffs' alleged injury to their property results from the presence of the Texas Eastern pipelines and those pipelines have been there since the 1950's. Defendant states that "according to AEC, the pipelines in their current active and unmitigated condition are preventing AEC from mining its coal." (Def.'s Mot. at 15). By this time, Defendant claims that Plaintiffs, or their predecessors in interest with respect to Century Mine, either knew, or should have known, the existence of the pipelines and their location over the coal estates identified in the Complaint.

Plaintiffs argue, however, that the Complaint alleges damages arising from Defendant's refusal to recognize Plaintiffs' superior property rights when it refused to develop, implement, and pay for a mitigation plan, which would allow Plaintiff American Energy to commence its mining activities pursuant to its permit. (Compl. ¶¶ 47, 98). Plaintiffs allege that this interference could not occur until, at the earliest, June 23, 2008, when Plaintiff American Energy notified Defendant of its intent to expand its permitted coal acreage to the areas under and adjacent to Texas Eastern's Transmission Lines. Further, Plaintiffs argue that the 1984 permit did not encompass the coal acreage at issue in this lawsuit. The Application for this particular adjacent area was submitted on June 11, 2008, and a permit revision was issued on March 31, 2009. (Compl. ¶¶ 31-34).

The Court finds that the Complaint with respect to this particular area of property was filed within the four-year statute of limitations. Though Defendant is correct that the general rule is that a claim for injury to property accrues when the owner knows, or reasonably should have known, that the injury occurred, *see Sexton v. City of Mason*, 883 N.E.2d 1013, 1021 (Ohio 2008), the coal acreage at issue in this case was not encompassed in the 1984 permit. Plaintiffs' Application for this area was submitted on June 11, 2008, and a permit revision was issued on March 31, 2009, well within the four year statute of limitations period. Accordingly, Defendant's Motion to Dismiss Plaintiffs' Complaint because it is barred by the statute of limitations is denied.

## E.    Nuisance Claim

Finally, Defendant Texas Eastern argues that Plaintiffs have failed to state a claim for private nuisance under Ohio law based on five reasons: (1) that Plaintiffs' Complaint only makes conclusory allegations which are insufficient to maintain a claim; (2) that Plaintiffs have failed to an affirmative act by Defendant to maintain a private nuisance *per se* claim; (3) that Plaintiffs have failed to allege that Defendant engaged in an abnormally dangerous activity; (4) that Plaintiffs have not alleged that Defendant performed some intentional and unreasonable/wrongful act for purposes of nuisance *per se*; and (5) that Plaintiffs have failed to establish a claim for qualified private nuisance.[8] The Court will address each argument in turn.

Under Ohio law, a private nuisance claim may be categorized as either an absolute or a qualified nuisance claim. *See Brown v. Scioto Cty. Commrs.*, 87 Ohio App. 3d 704, 712 (4th App.

---

[8] Defendant's fifth argument addresses a claim for qualified private nuisance, however, Plaintiffs clarify that their claim is for absolute, not qualified nuisance, and accordingly, Defendant's fifth argument need not be addressed. (*See* Pls.'s Memo. at 30).

Dist. 1993), (*quoting* Prosser & Keeton, Law of Torts (5th Ed.1984) 616, Section 86). "An absolute nuisance, or nuisance *per se*, consists of either a culpable and intentional act resulting in harm, or an act involving culpable and unlawful conduct causing unintentional harm, or a nonculpable act resulting in accidental harm, for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault." *Metzger v. Pennsylvania, Ohio & Detroit RR. Co.,* 146 Ohio St. 406 (1946). "A qualified nuisance, or nuisance dependent on negligence, consists of an act lawfully but so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another." *Id., following Taylor v. Cincinnati,* 143 Ohio St. 426, 432 (1944).

In a recent Ohio appellate court decision, *Ogle v. Ohio Power Co.*, 180 Ohio App.3d 44 (4th App. Dist. 2008), the court summarized nuisance law in Ohio:

> As we and many other courts have previously noted, "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.'" *Brown v. Scioto Cty. Commrs.* (1993), 87 Ohio App. 3d 704, 712, 622 N.E.2d 1153, quoting Prosser & Keeton, Law of Torts (5th Ed.1984) 616, Section 86. "Nuisance" is defined as "the wrongful invasion of a legal right or interest." *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 432, 28 O.O. 369, 55 N.E.2d 724. "Wrongful invasion" encompasses the use and enjoyment of property or of personal rights and privileges. *Id.* A "private nuisance" is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Brown* at 712, 622 N.E.2d 1153, citing Restatement of the Law 2d, Torts (1979), 100, Section 821D. Unlike a public nuisance, a private nuisance threatens only one or few persons. *Taylor* at 442, 28 O.O. 369, 55 N.E.2d 724, citing *McFarlane v. Niagara Falls* (1928), 247 N.Y. 340, 160 N.E. 391. In order for a private nuisance to be actionable, the invasion must be either (1) intentional and unreasonable or (2) unintentional but caused by negligent, reckless, or abnormally dangerous conduct. *Brown* at 712-713, 622 N.E.2d 1153, citing Section 822 of Restatement of the Law 2d, Torts at 113-115.

Plaintiffs' claim for private nuisance states:

98. TET's refusal to develop a mitigation plan and to commit to take and pay for mitigation measures on TET's Transmission Lines 10, 15, & 25, as well as to inactivate or take mitigation measures on Transmission Line 3, are acts that intentionally and wrongfully interfere with Plaintiffs' private interest, use, and enjoyment of the Coal Estates under TET's Transmission Lines 10, 15, & 25 and TET's Transmission Line 3.

99. Further, TET's refusal to develop a mitigation plan and take and pay for mitigation measures on TET's Transmission Lines 10, 15, & 25 creates abnormally dangerous conditions or activities that interferes with Plaintiffs' private interest, use, and enjoyment of the Coal Estates under TET's Transmission Lines 10, 15, & 25 and TET's Transmission Line 3.

100. TET has acted with malice by consciously disregarding the rights and safety of others, including the Plaintiffs and the public, and such disregard has a great probability of causing substantial harm. This is especially true considering TET is creating abnormally dangerous conditions or activities that interfere with Plaintiffs' private interest, use, and enjoyment and TET has already admitted in separate proceedings before FERC that it has to take and pay for such mitigation measures.

(Compl. ¶¶ 98-100).

### 1. Conclusory Allegations

Defendant Texas Eastern argues that Plaintiffs have failed to state a claim for private nuisance because they have only made conclusory allegations, and the Sixth Circuit has held that "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (Def.'s Mot. at 21-22) (citing Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)). Defendant argues that Plaintiffs' allegations that Texas Eastern's refusal to develop a mitigation plan and take and pay for mitigation measures "intentionally and wrongfully interfere[s]" with Plaintiffs' interest in the land at issue and "creates abnormally dangerous conditions or activities" that also interfere with that interest, are mere assertions of conclusory facts mixed with conclusions of law and, therefore, do not state a claim for private nuisance.

Plaintiffs argue, and this Court agrees, that Plaintiffs have alleged sufficient facts to satisfy the Rule 8 pleading standard and the Rule 12(b)(6) standard. The claims set forth above in paragraphs 98-100 of the Complaint, combined with all the other factual allegations in the Complaint, are more than just conclusory statements.

### 2. *No Affirmative Act*

Defendant asserts that Plaintiffs have failed to allege an affirmative act on the part of Texas Eastern. Defendant, relying on *Kaczor v. City of Bellaire*, 1998 Ohio App. LEXIS 3220 at *16 (Ohio Ct. App. 1998), asserts that nuisance *per se* "require[s], by definition, some affirmative act on the part of a defendant." Defendant argues in this case that Plaintiffs claim that Defendant Texas Eastern created the private nuisance by refusing to develop a mitigation plan and take and pay for mitigation measures, hence *refraining* from acting (not by affirmatively performing an act) and, therefore, have failed to state a claim for nuisance *per se*.

Plaintiffs argue in opposition that they have alleged an affirmative act, specifically that Defendant Texas Eastern continues to operate its gas lines without proper mitigation measures. In the alternative, Plaintiffs argue that even if they have not sufficiently alleged an affirmative act, a failure to act also satisfies the pleading requirement. *See Zangrando v. Kuder*, 2006 Ohio 1549, *9 (Ohio Ct. App. 2006) (defining nuisance as "[t]he class of torts arising from . . . conditions, acts, or **failures to act** [that interfere with the use or enjoyment of property]. . ..") (emphasis added); *see also Athens County Regional Planning Comm'n v. Simms*, 2006 Ohio 2342, *14 (Ohio Ct. App. 2006) (recognizing nuisance based on "unreasonable interference . . . through: (1) an act; or (2) **failure to act** under circumstances in which the actor is under a duty to take positive action or prevent or abate the interference") (emphasis added).

Plaintiffs have not, however, explained how the cases they relied upon get around the *Kaczor* court's holding that nuisance *per se* "require[s], by definition, some affirmative act on the part of a defendant." 1998 Ohio App. LEXIS 3220 at *16. The cases relied upon by Plaintiffs seem to be discussing the definition of nuisance in general, not the specific elements. Nonetheless, Plaintiffs do allege some affirmative act on the part of Defendant sufficient to state a claim for purposes of a motion to dismiss.

### 3. No Abnormally Dangerous Activity

Defendant argues that even assuming that Plaintiffs have sufficiently alleged that Defendant Texas Eastern performed an affirmative act, this "act does not constitute an abnormally dangerous activity for purposes of nuisance *per se*. In this context, an abnormally dangerous activity is one 'that cannot be maintained without injury to property, no matter what care is taken.' *R.T.G., Inc. v. State*, 780 N.E.2d 998, 1010 (Ohio 2002); *see also Brown v. County Commissioners of Scioto County*, 622 N.E.2d 1153, 1159 (Ohio Ct. App. 1993) (abnormally dangerous activities "are inherently injurious and cannot be conducted without damaging someone else's property or rights")." (Def.'s Mot. at 18).

Defendant argues the United States Supreme Court in *Panhandle Eastern Pipe Line Co. v. State Highway Comm'n,* 294 U.S. 613, 619-22 (1935), recognized that the operation of a gas pipeline does not constitute an abnormally dangerous activity. Defendant therefore argues that any refusal on its part to plan for, take, and pay for measures to protect its pipelines against subsidence-related harm is not something that, by necessity, will cause injury to someone else's property or other rights. Defendant further states that:

> [p]ipelines have been in operation in Monroe County for decades and there is nothing in the complaint to suggest that injury has occurred, even though, according to the complaint, Texas Eastern has yet to take the measures that AEC claims are essential. It is only because *AEC* is independently seeking to take mining actions that the risk of injury could arise. In addition, even if the operation of a gas pipeline were an abnormally dangerous activity (which it is not), the Ohio Court of Appeals has explained that, "although it would be a nuisance at common law, conduct which is fully authorized by statute or administrative regulation is not an actionable tort. This is especially true where a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct exist." *Brown*, 622 N.E.2d at 1159; *see also Hager v. Waste Technologies Industries*, 2002 Ohio App. LEXIS 3558 at **46 (Ohio Ct. App. 2002).

(Def.'s Mot. at 19).

Based on the aforementioned, Defendant Texas Eastern asserts that its conduct does not constitute negligence *per se* because it is fully authorized to operate its pipelines by way of approval given by FERC pursuant to the NGA, 15 U.S.C. §§ 717 *et seq.* In addition, Texas Eastern is required to operate the pipelines in accordance with the NGA, the PSA, and PHMSA's comprehensive regulations. AEC does not allege that Texas Eastern has failed to comply with any of these authorities with regard to pipeline operations and mitigation measures.

Plaintiffs argue that Defendant's argument misses the point. Plaintiffs explain that they "do not claim that pipeline operations are abnormally dangerous in and of themselves. What Plaintiffs claim is that, in these particular circumstances, TET's continued operation of its unsupported pipelines in their existing state necessarily interferes with AEC's superior property rights because it will prevent AEC from mining all of its coal." (Pls.'s Memo. at 32). Plaintiffs insist that they are not contesting Defendant's right to operate its pipelines, but want to proceed with mining activities without any obstruction by Defendant. Plaintiffs rely on *Texas Gas Transmission, LLC v. Butler Co. Bd. of Commissioners*, 2009 U.S. Dist. LEXIS 41813, at *64

(S.D. Ohio 2009) (Dlott, J.), arguing that the pipeline operator is charged with the responsibility to ensure compliance with the governing federal regulations and must pay for any necessary mitigation measure required to ensure such compliance while respecting others' superior property rights. The *Texas Gas* court stated, "[i]t is Texas Gas's responsibility to ensure that its pipelines remain in compliance with the federal regulations, regardless of any changes Butler County may make to Princeton Road or of who ultimately must pay for necessary changes to the pipelines. That Texas Gas may have to reinforce its pipelines to accommodate changes in the roadway does not alone call for an injunction preventing Butler County from proceeding with the improvements to Princeton Road." *Id.*

The Court agrees with Defendant that it is authorized to operate its pipelines pursuant to the NGA, and the operation itself does not constitute an abnormally dangerous activity. However, Plaintiff has raised the issue of whether Defendant must do so in a way that will not interfere with Plaintiffs' property rights. Ohio law defines abnormally dangerous activity for purposes of a nuisance claim as activity that is "inherently injurious and cannot be conducted without damaging someone else's property or rights." *See Brown*, 622 N.E.2d at 1159. Plaintiffs have therefore sufficiently alleged that Defendant's operation of its pipelines in the current state is damaging their property rights.

### 4. *Intentional Act*

Defendant argues that its alleged "refusal to plan for, take, and pay for mitigation measures does not constitute an intentional and unreasonable/wrongful act for purposes of nuisance *per se*. In addition, federal and Ohio statutory and regulatory law establishes that it is *AEC* that has the duty to protect the pipelines from subsidence-related harm.

*See, e.g.,* 30 C.F.R. § 817.180; Ohio Admin. Code § 1501:13-11-02(C)." (Def.'s Mot. at 19).

Plaintiffs, however, argue that as a matter of Ohio property law, Defendant is incorrect. Specifically, the regulations cited by Defendant do not address which party is responsible for the cost of mitigation. Plaintiffs assert that this is a real property issue. Plaintiffs further argue that Defendant's argument has nothing to do with the allegation of intentional interference.

Based on the same analysis set forth above with respect to the abnormally dangerous activity, the Court finds that Plaintiffs have sufficiently alleged a claim for private nuisance at this stage in the proceeding. Accordingly, Defendant's Motion to Dismiss for failure to state a claim of private nuisance is denied.


## IV. DISPOSITION

Based on the foregoing analysis, Defendant Texas Eastern's Motion to Dismiss is **DENIED**. All of Plaintiffs' claims remain pending.

The Clerk shall remove Document 4 from the Court's pending motions list.


**IT IS SO ORDERED.**

*/s/ George C. Smith*_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**